UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN AGUIAR,<br><br>  Plaintiff,<br><br>  v.<br><br>EXPERIAN INFORMATION SOLUTIONS, INC., et al.,<br><br>  Defendants. | No. 2:24-cv-02403-TLN-CSK<br><br>**ORDER** |

This matter is before the Court on Defendant Experian Information Solutions, Inc.'s ("Defendant") Motion to Compel Arbitration and Stay. (ECF No. 24.) Plaintiff Steven Aguiar ("Plaintiff") filed an opposition. (ECF No. 25.) Defendant filed a reply. (ECF No. 27.) For the reasons set forth below, the Court GRANTS Defendant's motion.

///

///

///

///

///

1

### I.   FACTUAL AND PROCEDURAL BACKGROUND

The instant action arises out of Defendant's allegedly inaccurate credit reporting services, in which Defendant falsely reported to Plaintiff's potential creditors that he had failed to make timely payments on his mortgage obligation for three consecutive months between November 2021 and January 2022.  (ECF No. 1 at 4, 12.)  On June 21, 2023, Plaintiff accessed the "CreditWorks" website (www.experian.com) — Experian's credit monitoring service — to receive a free credit report.  (ECF No. 25-2 at 2; ECF No. 24-1 at 10.)  To obtain the free credit report, Plaintiff had to create an online account with CreditWorks.  (ECF No. 25-2 at 2–3; ECF No. 24-2 at 2.)  To create a CreditWorks account, a user must first enter their personal information — including their name, address, phone number, and e-mail address — and create a password.  (ECF No. 24-2 at 3.)  A user must then click the "Create Your Account" button on the webform to enroll.  (*Id*.)  The following disclosure reads immediately below the personal information boxes: "By clicking 'Create Your Account': I accept and agree to your Terms of Use Agreement, as well as acknowledge receipt of your Privacy Policy."  (*Id.* at 7.)  The words "Terms of Use Agreement" and "Privacy Policy" are off set in bold blue hyperlinked text that, if clicked by a user, would present the user with the full text of the agreement.  (*Id*. at 3, 7.)  The Terms of Use Agreement contains the Arbitration Agreement at issue in this case.  (*Id.* at 4.)  Records show Plaintiff successfully created his CreditWorks account on June 21, 2023.  (*Id*. at 3.)

On September 4, 2024, Plaintiff initiated the instant action against Defendant for several alleged violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, et seq., and the California Credit Reporting Agencies Act ("CCRAA"), Cal. Civ. Code § 1785.14, et seq.  (*Id*.) On November 13, 2024, Defendant filed the instant motion to compel arbitration.  (ECF No. 24.) Defendant asserts that by creating a CreditWorks account, Plaintiff agreed to the binding arbitration provision located in the Terms of Use Agreement.  (*Id*.)

### II.   STANDARD OF LAW

In deciding whether to compel arbitration, a district court typically determines two gateway issues: (1) whether a valid agreement to arbitrate exists; and, if it does, (2) whether the agreement encompasses the dispute at issue.  *Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363

2

F.3d 1010, 1012 (9th Cir. 2004). "To evaluate the validity of an arbitration agreement, federal courts 'should apply ordinary state-law principles that govern the formation of contracts.'" *Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1170 (9th Cir. 2003) (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). If the court is "satisfied that the making of the arbitration agreement or the failure to comply with the agreement is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4. "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.* (*Moses H. Cone*), 460 U.S. 1, 24–25 (1983). If a court "determines that an arbitration clause is enforceable, it has the discretion to either stay the case pending arbitration, or to dismiss the case if all of the alleged claims are subject to arbitration." *Hoekman v. Tamko Bldg. Prod., Inc.*, No. 2:14-cv-01581-TLN-KJN, 2015 WL 9591471, at *2 (E.D. Cal. Aug. 26, 2015) (citation omitted).

There is an "emphatic federal policy in favor of arbitral dispute resolution." *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth*, 473 U.S. 614, 631 (1985). As such, "'any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability.'" *Id.* at 626 (quoting *Moses H. Cone*, 460 U.S. 1 at 24–25). "Because waiver of the right to arbitration is disfavored, 'any party arguing waiver of arbitration bears a heavy burden of proof.'" *Fisher v. A.G. Becker Paribas Inc.*, 791 F.2d 691, 694 (9th Cir. 1986) (quoting *Belke v. Merrill Lynch, Pierce, Fenner & Smith*, 693 F.2d 1023, 1025 (11th Cir. 1982), *abrogated on other grounds by Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213 (1985)). Therefore, an arbitration agreement may only "be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability,' but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 343–44 (2011) (quoting *Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 687 (1996)). Courts may not apply traditional contractual defenses, like duress and unconscionability, in a broader or more stringent manner to invalidate arbitration agreements and thereby undermine FAA's purpose to "ensur[e] that private

3

arbitration agreements are enforced according to their terms." *Id.* at 1748 (quoting *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989)).

### III. ANALYSIS

Defendant argues Plaintiff entered into a valid arbitration agreement when Plaintiff — in the process of creating a CreditWorks account — agreed to the Terms of Use Agreement governing that service, which included an Arbitration Agreement (the "Arbitration Agreement"). (ECF No. 24-1 at 9, 13.)[1] In opposition, Plaintiff argues Defendant has not met its burden of showing the existence of a valid agreement to arbitrate because Defendant's proffered evidence — the declaration of Dan Smith ("Smith") — is inadmissible. (ECF No. 25 at 10–18.) Plaintiff also argues the clickwrap agreement at issue is insufficient to support a finding Plaintiff assented to the Arbitration Agreement because the website failed to provide adequate notice that a user, by clicking the "Create Your Account" button, was agreeing to the Terms of Use Agreement. (*Id.* at 19–23.) The Court will first address these arguments regarding whether there is a valid agreement to arbitrate in turn and then address whether the agreement encompasses the dispute at issue. *See Lifescan, Inc.*, 363 F.3d at 1012.

#### A. Whether There is a Valid Agreement to Arbitrate

##### i. Whether Smith's Declaration is Admissible

In support of its motion to compel arbitration, Defendant proffers a declaration from Dan Smith ("Smith Declaration") to establish that Plaintiff enrolled in CreditWorks and assented to the Arbitration Agreement. (ECF No. 24-1 at 10–12; ECF No. 24-2 at 2.) In opposition, Plaintiff argues the Smith Declaration is inadmissible because Smith lacks personal knowledge of what Plaintiff "actually encountered" when he accessed the CreditWorks webpage on June 21, 2023. (ECF No. 25 at 12–14, 17.) Plaintiff notes Smith "neither cites to nor includes as evidence . . .

---

[1] Defendant also argues it is a party to the CreditWorks Terms of Use Agreement — and thus to the Arbitration Agreement — because the Arbitration Agreement defines Experian Consumer Services ("ECS") to include "affiliates." (ECF No. 24-1 at 9.) Defendant correctly recognizes that courts have routinely found Defendant to be an "affiliate" of ECS. (*Id.*); *see, e.g.*, *Capps v. JPMorgan Chase Bank, N.A.*, No. 2:22-CV-00806-DAD-JDP, 2023 WL 3030990, at *5 (E.D. Cal. Apr. 21, 2023) (collecting cases). However, Plaintiff does not oppose this argument and therefore concedes it. Thus, the Court will only address the remaining issues.

4

1    **any** internal records establishing the IP address of the device allegedly used on June 21, 2023,
2    demonstrating an audit or activity log for that IP address, or any other record which in any way
3    could prove to a reasonable jury that Plaintiff did, in fact, view and agree to the agreement[.]"
4    (*Id*. at 12 (emphasis in original).)  Moreover, Plaintiff argues Smith "could not possibly possess
5    'personal knowledge' sufficient to make his statements contained in his declaration" because
6    "Smith does not know Plaintiff . . . has never met Plaintiff . . . [and] was not present when
7    Plaintiff allegedly agreed to the terms and conditions with which [Defendant] seeks to bind
8    Plaintiff."  (*Id.* at 13–14.)
9         In reply, Defendant argues the Smith Declaration is based on his personal knowledge,
10   which he acquired in the course and scope of his position and through his review of pertinent
11   documents and internal records.  (ECF No. 27 at 7.)  Defendant contends this personal knowledge
12   was not of Plaintiff's specific actions, but rather of what a consumer would have seen when
13   completing their enrollment into CreditWorks, as Plaintiff did here.  (*Id*. at 7–8.)
14        Smith states in his declaration that he is the Director of Product Operations for
15   ConsumerInfo.com, Inc. ("CIC"), which does business as Experian Consumer Services ("ECS"),
16   an affiliate of Defendant.  (ECF No. 24-2 at 2.)  Smith further avers that he has been employed by
17   CIC for over 15 years and his current duties require him to be familiar with "how consumers
18   enroll, the forms they must complete to enroll . . . the Terms of Use governing such services . . .
19   [and] the webpages a consumer would have encountered to complete their enrollment[.]"  (*Id.*)
20   Smith's knowledge is based on "knowledge acquired in the course and scope of [his] job
21   responsibilities and through the review of pertinent data and documents maintained as business
22   records[.]"  (*Id*. at 2–3.)  Pertinently, the Smith Declaration states, "[i]n order to successfully
23   enroll, Plaintiff had to complete a single webform," which "required Plaintiff to enter his personal
24   information" and "click the 'Create Your Account' button on the webform[.]"  (*Id*. at 3.)  In
25   between the text boxes where Plaintiff entered his personal information and the "Create Your
26   Account" button, the following message was displayed: "By clicking 'Create Your Account': I
27   accept and agree to your Terms of Use Agreement, as well as acknowledge receipt of your
28   Privacy Policy."  (*Id*.)  This webform is attached to Smith's Declaration as Exhibit 1 and is

produced "as it would have appeared when Plaintiff enrolled in CreditWorks[.]" (*Id*. at 3.)

Based on the contents of the Smith Declaration, the Court finds Plaintiff's arguments unpersuasive. As an initial matter, Plaintiff admits he obtained a free credit report from Experian after successfully creating a CreditWorks account. (ECF No. 25-2 at 2.) Nowhere in his declaration does Smith assert to have personal knowledge of Plaintiff's actions on June 21, 2023. (*See generally* ECF No. 24-2.) Instead, the Smith Declaration establishes Plaintiff could not have obtained a free credit report from Experian without first creating a CreditWorks account, which requires a user to complete the webform depicted in Exhibit 1. (ECF No. 24-2 at 3.) To successfully submit that webform, a user is required to click the "Create Your Account" button. (*Id*.) Smith establishes in his declaration that he has personal knowledge of the *enrollment process*, gained through his duties and responsibilities as the Director of Product Operations for CIC, his employment by CIC for the past 15 years, and his review of internal records and documents. (ECF No. 24-2 at 3.) Further, the Ninth Circuit has made clear that "[p]ersonal knowledge may be inferred from a declarant's position." *In re Kaypro*, 218 F.3d 1070, 1075 (9th Cir. 2001) (holding that declarant's five-year tenure as manager lent support to his claim of personal knowledge of industry practice); *see also Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1018 (9th Cir. 1990) (holding that a chairman's and investment banker's personal knowledge of various corporate activities and competency to testify could be inferred based on "their positions and the nature of their participations in the matters to which they swore no abuse of discretion appears").

Plaintiff relies heavily on *Austin v. Equifax Info. Servs., LLC*, No. 3:22cv707, 2023 WL 8646275 (E.D. Va. Dec. 14, 2023), an unreported, out-of-circuit case. (ECF No. 25 at 14–16.) In *Austin*, Experian moved to compel arbitration, relying solely on the declaration of David Williams ("Williams"), the Vice President of Business Governance for CIC. 2023 WL 8646275, at *2. The district court excluded the declaration because the declarant's job description was too ambiguous to establish that Williams had personal knowledge of the CreditWorks sign-on or enrollment process. *Id*. at *4, 7. Moreover, Williams failed to identify the documents on which he asserted his personal knowledge and the court therefore could not "test the merits of the

6

asserted personal knowledge claimed to be based on them." *Id*. at *4, 7.  Lastly, the district court found the exhibits attached to the declaration were hearsay.  *Id*. at *4.

The Smith Declaration in this matter is distinguishable from the declaration in *Austin*. Here, Smith has provided his job title, his duties within that job, and the various systems, processes, and information that his job requires him to be familiar with — including the enrollment process into CreditWorks.  (ECF No. 24-2 at 2.)  Smith averred he familiarized himself with Experian's internal records documenting consumers' ongoing use of their CreditWorks account, like when a consumer logs into their account or changes their account information or receives an email or alert through their CreditWorks membership.  (*Id.*)  Smith also declared he was able to access Plaintiff's CreditWorks membership information from the ECS database and review his membership details, including the date and time of enrollment and the version of the Terms of Use Agreement he agreed to.  (*Id.*)  Unlike Williams in *Austin*, Smith has provided detailed information regarding his job duties and identifies the documents he reviewed that contained information concerning Plaintiff's CreditWorks account.  (*Id.* at 2–3.) Therefore, the Court finds that Smith has the requisite personal knowledge to attest to the statements set forth in his declaration.[2]

Accordingly, the Court finds Smith has sufficiently demonstrated personal knowledge of the CreditWorks enrollment process.  Based on the Smith Declaration and Plaintiff's admission that he successfully created a CreditWorks account, the Court concludes Plaintiff was presented with the webpage shown in Exhibit 1 and clicked "Create Your Account."  The remaining question is whether, by doing so, Plaintiff agreed to arbitrate his claims.

> ii.  *Whether Plaintiff Assented to the "Clickwrap" Arbitration Agreement*

Defendant argues Plaintiff agreed to the Terms of Use because he had clear notice of the Terms of Use at the time he enrolled, he was admonished that by clicking a button he was

---

[2]   Plaintiff also relies on two other non-binding, out-of-circuit cases.  (ECF No. 25 at 17 (citing *Newton v. Experian Info. Sols., Inc.*, No. CV 623-059, 2024 WL 3452895 (S.D. Ga. July 18, 2024); *Lamonaco v. Experian Info. Sols., Inc.*, No. 6:23-cv-1326-PGB-LHP, 2024 WL 1703112 (M.D. Fla. Apr. 19, 2024))).  Both cases are distinguishable, go against the weight of authority in the Ninth Circuit, and are currently on appeal.  (*See* ECF No. 27 at 3 (collecting cases)); *see also* Case Nos. 24-12398, 24-11270 (11th Cir. 2024).

agreeing to be bound by the Terms of Use, and he clicked the button and manifested his assent to the Terms of Use. (ECF No. 24-1 at 13.) In opposition, Plaintiff argues the clickwrap agreement in this case is insufficient to establish mutual assent under California law. (ECF No. 25 at 20.) Plaintiff claims he did not know he was re-routed to the CreditWorks site, was unaware that by creating his account he was agreeing to arbitrate all claims against Defendant and waiving his right to a jury trial, and did not see an arbitration agreement — or any mention of said agreement — when he created his account. (ECF No. 25-2 at 2–3.) In reply, Defendant argues Plaintiff ignores controlling case law and fails to identify how the webpage fails to place a reasonable consumer on notice that, by clicking the signup button, they are agreeing to the Terms of Use. (ECF No. 27 at 5.)

"[E]lemental principles of contract formation apply with equal force to contracts formed online." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855–56 (9th Cir. 2022). The Ninth Circuit has established the following analytical framework to determine whether "meaningful assent" has been given to a contract formed online:

> Unless the website operator can show that a consumer has actual knowledge of the agreement, an enforceable contract will be found based on inquiry notice theory only if: (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms.

*Berman v. Freedom Financial Network, LLC*, 30 F.4th 849, 857 (9th Cir. 2022). Accordingly, the Court will address in turn whether there was reasonably conspicuous notice of the terms and whether Plaintiff took action that unambiguously manifested his assent to those terms.

### *a) Reasonably Conspicuous Notice*

"Reasonably conspicuous notice" requires that (1) "a notice must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it" and (2) "while it is permissible to disclose terms and conditions through a hyperlink, the fact that a hyperlink is present must be readily apparent." *Id.* at 856–57. The court clarified that "[s]imply underscoring words or phrases . . . will often be insufficient to alert a

8

1  reasonably prudent user that a clickable link exists." *Id.* at 857.  Where the font is gray and "so
2  small that it is barely legible to the naked eye," it has been found to be the "antithesis of
3  conspicuous." *Id.* at 856–57.  In contrast, a hyperlink "distinguished from the surrounding text in
4  bright blue font" supports conspicuousness.  *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505,
5  516 (9th Cir. 2023).  The location of a hyperlink's placement on a webpage is also relevant.
6  *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177–78 (9th Cir. 2014).

7        Here, Plaintiff successfully accessed the CreditWorks webpage and was prompted with
8  the webform, as seen in Exhibit 1 of Defendant's motion.  (ECF No. 24-2 at 3.)  The webform
9  contains several text boxes for Plaintiff to enter personal information, including his name,
10 address, and email address.  (*Id.* at 7.)  Below these boxes is an asterisked notice in light text
11 providing context as to how the user's credit score is calculated.  (*Id.*)  Below the asterisked
12 notice is a series of bolded sentences that are particularly relevant.  (*Id.*)  The first sentence states:
13 "By clicking 'Create Your Account': I accept and agree to your Terms of Use Agreement, as well
14 as acknowledge receipt of your Privacy Policy."  (*Id.*)  The words "Terms of Use Agreement" and
15 "Privacy Policy" are both hyperlinked in bold blue font, in contrast with the bold black font of the
16 full sentence.  (*Id.*)  Had Plaintiff clicked the "Terms of Use Agreement" hyperlink, Plaintiff
17 would have been taken to the Terms of Use Agreement, which contains the Arbitration
18 Agreement.  (*Id.* at 3, 7.)  The subsequent sentences — approximately 10 lines of text — simply
19 notify Plaintiff that he has authorized Consumerinfo.com Inc., also known as ECS, to obtain
20 credit information on a regular basis to provide for or notify Plaintiff of his credit reports.  (*Id.* at
21 7.)  Lastly, the bottom section of the webform contains a large, purple button that spans the width
22 of the box with the text "Create Your Account" centered on the button.  (*Id.*)  By clicking this
23 button, Plaintiff completed the enrollment process and created his CreditWorks account.  (*Id.* at
24 4.)

25       At issue in this case is the hyperlinked "Terms of Use Agreement" language.  Here, the
26 hyperlink to the Terms of Use Agreement is in bold, just as the surrounding text, and is in a
27 contrasting blue color.  (*Id.* at 7.)  The hyperlink was positioned between the text fields and the
28 "Create Your Account" button — both of which the user must interact with to successfully create

1  an account and access their free credit report. (*Id.*) This type of formatting is conspicuous. *See,*
2  *e.g.*, *Capps*, 2023 WL 3030990, at *4; *see also Berman*, 30 F.4th at 856–57. The Arbitration
3  Agreement is also conspicuously positioned within the Terms of Use Agreement.[3] (*See* ECF No.
4  24-2 at 15–19.) As the court did in *Scribner*, 738 F. Supp. 3d at 1308, this Court finds Plaintiff's
5  reliance on several non-binding, unreported cases from other circuits unpersuasive (*see* ECF No.
6  25 at 20–22), as numerous courts in the Ninth Circuit have found substantially similar website
7  designs to provide reasonably conspicuous notice. *See, e.g., Capps*, 2023 WL 3030990; *Saucedo*
8  *v. Experian Info. Sols., Inc.*, No. 1:22-CV-01584-ADA-HBK, 2023 WL 4708015 (E.D. Cal. July
9  24, 2023); *DeVries*, 2017 WL 733096; (*see also* ECF No. 24-1 at 7–9 (collecting cases)).

Therefore, the Court finds the CreditWorks webpage provided reasonably conspicuous notice of the Terms of Use Agreement because of the hyperlink's placement, color, size, and boldness. Therefore, Plaintiff had constructive notice of the Arbitration Agreement.

                                                                                                      *b)*        *Unambiguous Manifestation of Assent*

"A user's click of a button can be construed as an unambiguous manifestation of assent only if the user is explicitly advised that the act of clicking will constitute assent to the terms and conditions of an agreement." *Berman*, 30 F.4th at 857. The existence of assent is determined by objective rather than subjective criteria, looking at what outward manifestations of consent would lead a reasonable person to believe the offeree has assented to the agreement. *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014). Therefore, Plaintiff's claim that he did not subjectively assent to arbitration is irrelevant. (*See* ECF No. 25-2.)

Here, the webpage Plaintiff encountered advised that if he clicked "Create Your Account," he would be agreeing to the Terms of Use Agreement. (*See* ECF No. 24-2 at 7.) Given the clarity of the notice presented to Plaintiff on the webpage, a reasonable person would interpret Plaintiff's outward conduct — clicking the "Create Your Account" button — as assent to the Terms of Use Agreement. *See Knutson*, 771 F.3d at 565; *cf. Nguyen*, 763 F.3d at 1176–77

---

[3] Plaintiff does not argue whether the Arbitration Agreement is conspicuously arranged within the Terms of Use Agreement, and thus the Court declines to engage in an in-depth discussion of this potential argument. (*See generally* ECF No. 25.)

10

(stating courts have been "more willing to find the requisite notice for constructive assent where the browsewrap agreement resembles a clickwrap agreement . . . [and] the website contains an *explicit textual notice* that continued use will act as a manifestation of the user's intent to be bound.") (emphasis added).  Therefore, the Court finds Plaintiff unambiguously assented to the Terms of Use Agreement, and thus, the Arbitration Agreement.

      B. <u>Whether the Arbitration Agreement Encompasses the Claims at Issue</u>

   The Court declines to address whether the Arbitration Agreement within the Terms of Use Agreement encompasses Plaintiff's claims for two reasons.  First, Plaintiff does not dispute his claims fall within the scope of the Arbitration Agreement.  (*See* ECF No. 25.)  Second, the Arbitration Agreement provides that "[a]ll issues are for the arbitrator to decide including, but not limited to, (i) all issues regarding arbitrability, [and] (ii) the scope and enforceability of this arbitration provision as well as the Agreement's other terms and conditions[.]"  (ECF No. 24-2 at 18.)  The Supreme Court, Ninth Circuit, and district courts have found that a delegation clause constitutes clear and unmistakable evidence of an intent to delegate.  *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 66 (2019); *Momot v. Mastro*, 652 F.3d 982, 988 (9th Cir. 2011) (finding the language "the validity or application of any of the provisions of" the arbitration clause constitutes "an agreement to arbitrate threshold issues concerning the arbitration agreement" (internal quotation omitted)).  When the parties' contract delegates the arbitrability question to an arbitrator, "a court possesses no power to decide the arbitrability issue." *Id.*; *see also Capps*, 2023 WL 3030990 at *6 (collecting cases).  In sum, the delegation provision clearly and unmistakably provides that the enforceability of the agreement is a question for the arbitrator, not the Court.  Accordingly, the Court GRANTS Defendant's motion to compel to allow the arbitrator to decide these gateway issues and, if permissible, to arbitrate the substantive claims.

//
//
//
//
//

### IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Defendant's motion to compel arbitration and stays this action for the duration of arbitration pursuant to 9 U.S.C. § 3. The parties are directed to file a joint status report within thirty (30) days after a final arbitration order is issued.

IT IS SO ORDERED.

Date: May 28, 2025

_____
TROY L. NUNLEY
CHIEF UNITED STATES DISTRICT JUDGE